Gullatt vs. Thrasher et al.

H. GULLATT, prochien ami of MRS. BARNES, plaintiff in error, vs. JOHN J. THRASHER et al., defendants in error.

JOHN J. THRASHER et al., plaintiffs in error, vs. H. GULLATT, prochien ami of MRS. BARNES, defendant in error.

1. It is error in the Judge of the Superior Court to dismiss a bill in vacation, except upon demurrer by the defendant.
2. The fact that a partnership engaged in the foundry business, took and executed a contract with the Confederate Government, to furnish certain munitions of war, is not of itself sufficient to so vitiate the genera proceeds of the business, as to render illegal a note given by some of the members of the firm to others, even though the note be based upon the proceeds of the general business.
3. Where the equity of the bill is denied by the answer and accompanying affidavits, this Court will not disturb the judgment of the Court below in dissolving the injunction.

Equity Practice.    Injunction.    Before Judge PARROTT. Chambers.    Fulton County.    August, 1870.

The bill of the next friend of Mrs. Barnes made this case against James E. Gullatt, as administrator of William Barnes, complainant's husband, and J. J. Thrasher, and other nominal parties. In October, 1862, James E. Gullatt, Rhodes and William Barnes, styled Gullatt & Company, agreed with Thrasher as follows: Gullatt & Company and Thrasher were to associate in the machine and foundry business; the amounts to be put in by the firm and by Thrasher were fixed; the firm was to have half the profits and bear half the losses, and Thrasher the other half. This firm was to last three years, unless sooner dissolved by consent, and at the end, the property was to be equally divided between the firm and Thrasher. One Harris was to represent Thrasher at Thrasher's expense, keep the books, and make contracts for the new firm. They were to work only for cash, except on "government work," and have settlements quarterly. Gullatt, Rhodes & Thrasher signed this contract, and Gullatt signed Barnes' name thereto. Barnes was then a soldier in the Con-

federate army; had left one Mecaslin as his sole agent, and Gullatt had no right to sign his name to said contract.

To carry out this contract, these parties bought out Dunning's foundry, in Atlanta, Georgia, and contracted with the Confederate government to furnish it with implements of warfare, Gullatt signing Barnes' name thereto, without authority. They carried on the business till December, 1863. They then had a disagreement, because Thrasher, instead of advancing money, as he had promised, *individually*, had borrowed money in the firm name, and owed the firm about $14,000 00. They stopped business awhile, because of this misunderstanding. Upon Harris' statement, it appeared that the firm owed Thrasher $12,123 00, and for that amount a note was given to Thrasher, dated the 15th of December, 1863, and due one day after date, signed by Gullatt, Rhodes and Barnes. Gullatt signed Barnes' name to said note, without authority, although Mecaslin refused to sign Barnes' name thereto, which was known to all the parties. Barnes received no consideration for this note, and knew nothing of it. If any, it was working for the Confederate States, in making war material, and the note is therefore void. In 1864, Barnes died. In 1865, Gullatt administered upon his estate. In March, 1866, Thrasher and Gullatt submitted the matters of difference between them to arbitration. The arbitrators determined upon said note, finding nothing against Barnes' estate, and that Gullatt owed Thrasher only $327 97. The submission is not exhibited. An award by two arbitrators, as to a matter submitted by "J. J. Thrasher and James E. Gullatt" was, that the settlement of December, 1863, disposed of matters prior thereto; that Gullatt owed now to Thrasher $327 97, upon payment of which Gullatt was to be discharged from said note of 15th December, 1863, and from another note, for $1,467 67, to Thrasher, made by Gullatt and Rhodes in December, 1863. Thrasher refused to abide by this award. Subsequently, Thrasher and Gullatt, intending to defraud Barnes' estate, on the 15th of April,

1867, made a contract, whereby Gullatt, as administrator of Barnes, agreed to pay Thrasher $600 00, three months after said date, and Gullatt, individually, promised to pay him $700 00, in compromise of said note for $12,123 41, and another on Gullatt, individually, for $1,200 00, dated the 7th of January, 1864, and due the 5th of February, 1864. Gullatt guaranteed the payment of this $600 00 note.

Gullatt had no authority thus to bind Barnes' estate, and when his securities on his administration bond found he had so acted, they notified the Ordinary that they would no longer stand his security. Gullatt has given no other security, and is insolvent. Thrasher sued Gullatt, as administrator of Barnes, on said $600 00 note. Gullatt made no defense, Thrasher obtained a judgment, and has had the *fi. fa.* issued upon it, and levied upon Barnes' property. Mrs. Barnes knew nothing of all this till the sheriff notified her of said levy. The prayer was to enjoin said *fi. fa.*, and set aside said judgment, etc. There being no Judge for the Atlanta Circuit, Judge Parrott granted the injunction.

The defendants answered the bill. Rhodes' answer is not material, as the real fight was with Thrasher. He answered that Barnes knew of the purchase of the foundry, and being at home on furlough, learned what had been done and fully approved of it all, ratified Gullatt's signature of his name to the contract, accepted his share of the profits of work done for the Confederate States and others. Barnes, in person, advanced some of the money to pay for the foundry and stock, and fully recognized Gullatt as his agent, as to the foundry business. Thrasher never gave the firm notes, except for firm stock. He never was a defaulter, nor owed the firm anything. After said disagreement, it was ascertained that Thrasher had paid most of the $50,000 00 given for the foundry, and the firm owed him $12,123 00 of the purchase-money, and for this, said first note was given, and when Barnes came home, he ratified Gullatt's signing his name thereto. The reason why the others resumed the busi-

ness may have been to avoid conscription, but that was not Thrasher's reason. After Barnes' death, his interest in the foundry was sold at $1,800 00, and Mrs. Barnes got the money, in good currency. Gullatt promised to pay the $600 00 note out of the proceeds of that sale, but did not.

There was no submission to arbitration of any claim, except Thrasher's against Gullatt individually; Gullatt brought in cross-claims and reduced the recovery. One of the arbitrators told Thrasher he did not understand the matter when the award was made. Thrasher refused to be bound thereby, and subsequently he and Gullatt compromised in April, 1867. The compromise as to Barnes' estate was ratified by the Ordinary of the county. Rhodes relieved himself from said note by paying Thrasher $1,500 00 after Mrs. Barnes got said $1,800 00. The last obligation taken on Gullatt, and Gullatt, as administrator of Barnes, was for the like consideration as Rhodes' obligation, to-wit: said first note of $12,123 00. He insisted that his note for $600 00 was for the purchase-money of the very property for which Mrs. Barnes received said $1,800 00.

Gullatt answered that the consideration of the $12,123 00 note was Thrasher's agreement to assume and pay $1,4000 00 which the firm owed; that the profits of the firm paid the purchase-money; that from the beginning of the business they made shot and shells for the Confederate States, and got pay therefor. He denied that Barnes knew that he signed said note or ratified it afterwards. He said he intended defending against said suit but forgot when to plead.

Upon the coming in of these answers Thrasher moved, in vacation, to dissolve the injunction. At the hearing various affidavits were read in support of the bill, and Thrasher's answer respectively.

The Judge dissolved the injunction and dismissed the bill· Complainant's solicitors sued out a bill of exceptions, averring that Thrasher moved to dissolve the injunction *and dismiss* the bill, and that the Judge erred in granting the mo-

Gullatt *vs.* Thrasher *et al.*

tion. He certified this bill of exceptions to be true. That made one case here.

Thrasher's solicitors sued out another bill of exceptions, averring that they moved only to dissolve the injunction and that the Judge wrote an order simply dissolving the injunction; that complainant's solicitors then asked whether he would dismiss the bill, to which he replied in the negative; after consulting with complainant's solicitors, the Judge determined to dismiss the bill that the cause might end, as he had determined that there was no equity in the bill and that this decision might be reviewed by the Supreme Court, and changed the order. Thrasher's solicitors say the Court erred in dismissing the bill when they had not moved to dismiss it; in holding private consultation with complainant's solicitors, and changing his order at their instance, and in certifying that a motion to dismiss the bill was made when none was made. This bill of exceptions duly certified, made the second case. They were argued and decided as one.

HULSEY & TIGNOR, for Mrs. Barnes.

THRASHER & THRASHER, for Thrasher.

McCAY, J.

The powers of a Court of Equity are in the Superior Court. Though, in many respects, the Judge acts independently of the jury, yet, it is while he is upon the bench, and during the session of the Court, that his functions are performed. His powers during vacation are exceptional, and generally are specially pointed out by law: Revised Code, 3150, 3151. With the exception of that jurisdiction exercised by the Court in the protection of trust-estates, and the property and person of wards in Chancery, (Code, 4162,) there are but few acts which the Chancellor may perform in vacation, except acts to preserve things *in statu quo* until a hearing, and orders in reference to process; and, as a general rule, these

powers are specially granted by statute. The Act of 1869, pamphlet 136, allows a Chancellor to hear and determine a *demurrer* in vacation, and prescribes how it shall be done.

1. In this case there was no demurrer; the complainants did not have any notice of a demurrer. The motion was to dissolve the injunction. It is true that the equity of the bill is involved in this motion; but the uniform practice, in this State, has been, on a motion to dissolve, to let the bill stand, even though the injunction be dissolved for want of equity. We have no doubt, too, that there is equity in this bill. If its charges be true, the whole of this foundry business contract was unauthorized, and all the proceedings of this administrator, in reference thereto, void and a fraud. It is true the answer and affidavits very completely negative this charge, as to the want of authority, but it is not for the Judge to determine, finally, the issues made by the parties. That is the province of a jury.

2. As to the question, so elaborately argued, whether the note, out of which grew the judgment sought to be enjoined, was for part of the purchase-money for the property bought, or was mixed up with the proceeds of the enterprise, we do not see its importance. If there be no fraud nor illegality in procuring the judgment, (and that question must be held concluded by the judgment,) and if that is assumed, then we do not think that the *mere* fact that a *portion* of the company's profits came from work done for the Confederate government, so vitiates the fund as to make a note founded on a division of that fund illegal. If the *enterprise* was for the purpose of making this war material, and it could be made distinctly to appear that this was a contest over the results of this illegal enterprise, there would, perhaps, be point in the position taken by the defendant.

3. Taking the answer and affidavits together, we think the Court committed no error, justifying our interference, in dissolving the injunction. Under the rule we have so often

laid down, he has a large discretion in such cases, which we have no right to control unless his discretion be abused.

We therefore reverse the judgment dismissing the bill, and affirm the dissolution of the injunction.